## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

### Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety (KDPS) for about 16 years, the last 8 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance and firearm laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21

U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c); felon in possession of firearms, in violation of 18 U.S.C. §922(g)(1); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

2. I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic device, ("**Subject Device 3**[1]") and its contents:

    a. **Subject Device 3**: Black iPhone 12, Model A2172, IMEI 352784729407943, with several cracks.

3. **Subject Device 3** was seized by KDPS officers during a traffic stop on at North Rose Street and West Michigan Avenue in Kalamazoo County, MI on August 29, 2024. **Subject Device 3** is currently in the possession of law enforcement located at KDPS Headquarters (150 E Crosstown Pkwy, Kalamazoo, MI, 49001).

4. The applied-for warrant would authorize the forensic examination of **Subject Device 3** for the purpose of identifying electronically stored data particularly described in Attachment B.

5. I respectfully submit that there is probable cause to believe evidence that Lonnie Laronn MORROW: knowingly and intentionally possessed with intent

---

[1] Subject Device 1 & 2 were previously identified in a federal search warrant/continuation 1:24-mj-00176, signed May 6, 2024, by U.S. Magistrate Judge Phillip J. Green.

2

to distribute controlled substances, in violation of 21 U.S.C §§ 846, 841(a)(1), will be found on **Subject Device 3**.

6. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is probable cause for the requested search of **Subject Device 3** and does not set forth all of my knowledge about this matter.

## Background

7. Lonnie Laronn MORROW is a 32-year-old resident of Kalamazoo, MI. MORROW has numerous felony convictions to include:

    a.  2009 – Receiving and Concealing Stolen Property

    b.  2010 – Breaking & Entering a Building with Intent

    c.  2018 – Controlled Substance Possession (cocaine/heroin/another narcotic) less than 25 grams

    d.  2018 – Home Invasion 3rd Degree & Habitual Offender Notice

8. On March 9, 2024, KDPS patrol officers initiated a traffic stop on a silver 2023 Ford F150 pickup truck, with Colorado license plate BHVH37 the vehicle on Interstate 94 near the 84-mile marker just west of Galesburg, MI in Kalamazoo County, MI. This was a rental vehicle owned by Avis Budge Car LLC.

9. During the traffic stop:

    a.  MORROW was identified as the driver of the vehicle, his girlfriend, Haley Reardon, as the rear seat passenger along with

3

  two small children.

b. MORROW was arrested on an outstanding local warrant without incident. On his person investigators located Subject Device 1.

c. A KDPS K-9 conducted a free air sniff of the vehicle and alerted to the odor of narcotics from the vehicle.

d. During a search of the vehicle, under the driver's seat officers located a plastic grocery bag containing ten sandwich size ziploc bags filled with blue "M30" labeled pills.

(i) The pills were tested by the KDPS crime lab and determined to be approximately 10,800 pills or a combined 1,195 grams of fentanyl.



e. A digital scale calibration weight was located on the front passenger floorboard and a digital scale was located between the front passenger seat and the center console.

f. Subject Device 2 was located in the center console area with the GPS enabled.

4

10.     MORROW was read his Miranda warnings and spoke with officers. MORROW stated they had been in Muncie, IN visiting his grandmother, had arrived the day prior, and went with Reardon and their two children. MORROW was asked about the vehicle and stated it was his "peoples" and he had been driving it for three days. MORROW denied knowledge about the pills in the vehicle. MORROW was told someone in the vehicle must have knowledge of the substance and he responded that they did not belong to the female, Reardon, and she had nothing to do with it. MORROW continued to deny knowledge of the pills and blamed others that had previously driven the vehicle. MORROW stated had he known drugs were in the vehicle, he would have fled. MORROW was asked about the phones located in the vehicle. MORROW identified Subject Device 2 as belonging to him. Two other phones were found in the vehicle which MORROW identified as belonging to Reardon and his daughter. Investigators seized the Subject Devices 1 & 2 and they have remained in the custody of law enforcement since the date of seizure.

11.     The rear-passenger, Reardon, was also read her Miranda warnings and spoke with officers. Reardon also stated she, MORROW, and the kids had gone to Muncie, IN to visit family. They left on March 8, 2024 and stayed at a hotel. She stated the next morning, MORROW did leave the hotel on his own and was gone a few hours. MORROW had told her he was going to workout and this was the only time they were not together. Later that day, they visited MORROW's grandparents and left. Upon arrival back in Kalamazoo, MORROW was going to drop her and the children off at the Milham Meadows apartment complex in Portage, MI. She did not

5

know for sure where MORROW was going to go but believed he would go to Fox Ridge Apartments and his mother had recently moved to a new building in the complex but she did not know which one. Reardon denied knowledge of the drugs in the vehicle.

12. MORROW was arrested on a local bench warrant and lodged at the Kalamazoo County Jail.

13. Following the traffic stop, KVET investigators obtained a State of Michigan search warrant for 1312 Fox Ridge Dr, Apt 104, Kalamazoo, MI. Prior to the March 9, 2024 traffic stop, MORROW was surveilled at the Fox Ridge Apartment complex on multiple occasions. Investigators learned that MORROW's mother, Jalonda Wright, began renting Apartment 104 around February 2024. The warrant was signed and executed that same evening. Entry was made into the apartment utilizing a key located in MORROW's vehicle during the traffic stop.

14. During a search of the apartment investigators located:

    a. Bedroom:

        i. Documents for MORROW.

        ii. Money counter under the bed in bedroom.

        iii. $500 US Currency on nightstand and ID for MORROW.

        iv. Safe under the bed which contained 178.94 grams of cocaine HCL, digital scale, and $12,350 US Currency.

    b. Kitchen

        i. Pyrex measuring cup in a cabinet with white residue.

  c. Hallway Closet:

    i. Guitar case containing two AR pistols, one with a loaded magazine and ammo.

    ii. Digital scale with white residue.

    iii. Several unknown orange pills

    iv. Tan handgun and magazine.

15. I obtained a federal search warrant (1:24-mj-00176) for Subject Devices 1 & 2, which was signed on May 6, 2024, by U.S. Magistrate Judge Phillip J. Green. Examination of Subject Device 1 showed evidence that MORROW utilized his cellphone for drug trafficking, to include communicating suspected drug transactions with customers and taking pictures of controlled substances.

16. On July 16, 2024, MORROW was indicted by a federal grand jury in the Western District of Michigan (1:24-cr-00098-HYJ) on charges of possession with intent to distribute fentanyl, possession with intent to distribute cocaine, and being a felon in possession of a firearm. A federal arrest warrant was issued for MORROW at the same time.

## Probable Cause

17. On August 29, 2024, KVET investigators conducted an operation to arrest MORROW on the outstanding federal arrest warrant.

18. At approximately 11:15am, investigators observed MORROW exit Reardon's apartment at 6043 Eagle Ct, Portage, MI. MORROW went to a KIA Sorento SUV parked in front of the apartment, got something out of the vehicle, and

then proceed to make a short-term contact with the driver of silver Chrysler 200 sedan in the parking area. MORROW was observed reaching into the driver's side window and then walking away from the vehicle while putting something in his pocket. This contact was indicative of a drug transaction. Investigators maintained surveillance of MORROW outside the apartment where he was observed using his phone. Eventually MORROW was picked up by a female driving a black Buick sedan.

19. Investigators maintained surveillance of the vehicle and MORROW. KVET requested a KDPS patrol officer to assist with a traffic stop on the vehicle to arrest MORROW.

20. A traffic stop was conducted on the black Buick sedan at North Rose Street and West Michigan Avenue. Officers contacted MORROW who was in the front passenger seat. MORROW was holding **Subject Device 3** in his hand. MORROW was requested to exit the vehicle. MORROW bladed his body away from the officer and began to manipulate an object on his left side. Officers then observed MORROW dropping items between his seat (front passenger) and the center console.

21. MORROW eventually exited the vehicle and was secured in handcuffs. MORROW was searched incident to arrest. US Currency, a digital scale and a piece of aluminum foil contained a compressed white powder was located on his person.

    a. This substance was tested by the KDPS crime lab and determined to be 24.29 grams of cocaine HCL.

22. During a search of the Buick sedan, officers located a plastic baggie

8

with white chunk material and a baggie of blue pills. These items were located in the exact area officers had seen MORROW discarding things from his person upon being told to exit the vehicle, between the front passenger seat and center console.

    a.    The baggie with white chunk material was tested by the KDPS crime lab and determined to be 31.79 grams of cocaine base.

    b.    The blue pills were tested by the KDPS crime lab and determined to be 50 pills (5.28 grams) containing fentanyl.

23.    Following his arrest, MORROW was read his Miranda warnings and agreed to speak with officers. Upon arrival at the Kalamazoo County Jail, MORROW made an admission that he would sell small amounts [of drugs] to provide for his children and was not trying to "showboat" or anything.

24.    MORROW was lodged at the Kalamazoo County Jail on the outstanding federal arrest warrant pending transport to the USMS. **Subject Device 3** was seized by law enforcement and remains secured with KDPS HQ at 150 E Crosstown Parkway, Kalamazoo, MI.

25.    Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a.    Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

    b.    Drug traffickers sometimes use electronic messaging or

messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

      b.     Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

      d.     Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

      e.     It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers. These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

      f.     That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants,

10

casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

      g.      User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

      h.      Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

## Technical Terms

36.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and

11

playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can

store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

37. Based on my training, experience, and research, I know that the **Subject Device** has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and other evidence of drug trafficking.

**Electronic Storage and Forensic Analysis**

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

39. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Subject Device 3** was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **Subject Device 3** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its

proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Subject Device 3** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

41.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this

warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

42. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Subject Device 3** described in Attachment A to seek the evidence of drug trafficking and weapons offenses described in Attachment B.